(No. 38079.—

GLADSTONE CAB COMPANY, Appellee, *vs.* ROBERT R. DONNELLY, Director of Labor, Appellant.

*Opinion filed March 18, 1964.*

WILLIAM G. CLARK, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, Assistant Attorneys General, of counsel,) for appellant.

CATHERINE COOK ANAGNOST, GERALD M. CHAPMAN, and EDMOND MOSLEY, all of Chicago, for appellee.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant Director of Labor, assessed plaintiff $1,705.76 for contributions and interest due under the Unemployment Compensation Act (Ill. Rev. Stat. 1955, chap. 48, par. 680) based upon wages paid plaintiff's drivers in 1957, 1958, 1959 and the first two quarters of 1960. After a hearing on plaintiff's protest to the assessment, defendant's representative affirmed the assessment and plaintiff then filed its complaint for administrative review. The circuit court of Cook County reversed the findings of the Director, who brings this direct appeal under section 2205 of the Unemployment Compensation Act. Ill. Rev. Stat. 1961, chap. 48, par. 685.

Plaintiff is an Illinois corporation owning a taxicab business in the village of Elmwood Park. It furnishes taxicab service to the public as the licensee of various municipalities including Elmwood Park and owns certain automobiles used

as taxicabs under those licenses. It maintains telephone listings in the alphabetical and classified sections of the telephone directories for the communities where it is licensed, provides waiting rooms, dispatchers' offices, and cab stands subject to municipal regulations, provides radio dispatching service and provides oil, repairs, anti-freeze and general maintenance for the cabs at its own garage. It also pays for car washes and provides public liability and property damage insurance. From 1957 through 1960 plaintiff employed from 8 to 11 employees as mechanics, grease-monkeys and dispatchers. It maintains payroll records for these employees and also maintains informal records of the drivers shares of receipts so that each driver would know how much to report for income tax purposes, but plaintiff did not maintain a company payroll for them.

Before taking out a cab, each driver entered into an "automobile rental contract" with plaintiff which designates the plaintiff as a bailor and the driver as a bailee and the transaction is described in the contract as one of rental or leasing of the automobile. The driver, by the contract, agrees to pay an undesignated sum per mile that the cab is operated while in his possession, actual or constructive with a minimum payment of one dollar per day or part thereof. He supplies his own gasoline, and agrees to deliver the cab back to the company at the end of each 12 hours in as good condition, reasonable wear and tear excepted, as the cab was when received by him. The company agrees to carry all property damage insurance and personal injury insurance as may be required by the statutes of the State of Illinois covering the operation of the automobile. It bears the risk of damages which are not caused by the gross, willful or wanton negligence of the driver or while the driver is under the influence of intoxicating liquors. The driver agrees to comply with the rules and regulations of the police department and city ordinances of the municipalities in which the cab is operated and further agrees that he will

not rent or otherwise engage or use the cabs of any other company operating in competition with the company in any way.

Section 6 of the rental agreement further provides specifically that the relationship of employer and employee does not exist between the parties and the company accepts no responsibility for injuries to the driver resulting from the use or operation of the automobile or while the automobile is in the possession, either constructive or actual, of the driver. The agreement further recites that the driver is at all times free from control or direction of the company and the company is not to exercise or attempt to exercise any supervision over the services performed by the driver.

At the hearing before the defendant's representative, plaintiff introduced testimony of officers and drivers of the company to substantiate its position that an employer-employee relationship between the company and the drivers did not exist and to establish that the drivers were, in fact, independent contractors. The uncontroverted testimony establishes that the drivers are not carried as employees on the company's books or payroll records; that every driver signs the contract above referred to before he takes a cab or starts working and that the contract is also signed by an officer of the company; that the arrangement for payment that exists between the company and the driver is for the driver to get 50% of the meter charges, from which he pays for his gasoline, and the remaining 50% is turned over by the driver to the company when the cab is returned. The drivers pay for none of the services such as telephone, offices, waiting room and cab stands. The only regulations of the company affecting the driver relate to his being neat and courteous to a customer and forbid drinking on the job. Two officers of the company testified that the drivers are not compelled to use the cab stands and are not required to accept calls relayed by the dispatcher. The driver has his option to accept the call or refuse it, to park in the cab stand

or other places or to cruise. Two drivers who had driven plaintiff's cabs for over two years and who entered into the automobile rental contract above referred to testified that they operated under the contract and all other drivers that they knew about operated without any control from the company. Neither of them knew of any driver who had been fired for any cause. The evidence further established that all of the cabs are the same color and that only the driver who signs the contract is permitted to drive the cab. Unless the cabs operate, the company has no income. Defendant introduced no evidence.

The application of the Unemployment Compensation Act to taxicab operations has been considered twice by this court in recent years. Plaintiff contends that the present case is controlled by *Parks Cab Co.* v. *Annunzio,* 412 Ill. 549, where we held that taxicab drivers owning their own cabs who entered into written leases with the owner of cab stand licenses for $60 per week rental, rendered no services for the lessor of cab licenses, and hence no employer-employee relationship existed within the meaning of the Unemployment Compensation Act. On the other hand, defendant Director stresses the similarity between the facts here and those in *Myers* v. *Cummins,* 9 Ill.2d 582, where we held that an owner of a licensed taxicab who leased the cab to a driver for one-half of the fares collected, maintained cab stands, waiting rooms and telephone listings, accepted and relayed calls, assumed all expenses of insurance and repairs, and who required the driver to join a cab drivers union and abide by all the operating rules and regulations of the owner, was an employer of the driver within the meaning of the act.

This case, as did *Parks* and *Myers,* involves the following sections of the Illinois Unemployment Compensation Act (Ill. Rev. Stat. 1961, chap. 48, pars. 316, 322, 344, 350 and 550, respectively):

"§ 206. Subject to the provisions of Sections 207 to

233, inclusive, and of subsection B of Section 245, 'employment' means any service performed prior to July 1, 1940, which was employment as defined in this Act prior to that date, and any service after June 30, 1940, performed by an individual for an employing unit, including service in interstate commerce and service on land which is owned, held or possessed by the United States, and including all services performed by an officer of a business corporation, without regard to whether such services are executive, managerial, or manual in nature, and without regard to whether such officer is or is not a stockholder or a member of the board of directors of the corporation."

"§ 212. Service performed by an individual for an employing unit, whether or not such individual employs others in connection with the performance of such services, shall be deemed to be employment unless and until it is proven in any proceeding where such issue is involved that—

A. Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

B. Such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

C. Such individual is engaged in an independently established trade, occupation, profession, or business."

"§ 234. Subject to the provisions of Sections 235 and 245 C, 'wages' means every form of remuneration for personal services, including salaries, commissions, bonuses, and the reasonable money value of all remuneration in any medium other than cash. The reasonable money value of remuneration in any medium other than cash shall be estimated and determined in accordance with rules prescribed by the Director. Such rules shall be based upon the reasonable past experience of the workers and the employing units concerned therewith.

"Where gratuities are customarily received by an individual in the course of his work from persons other than his employer, such gratuities shall, subject to the provisions of this paragraph, be treated as wages received from his employer. Each such employer shall notify each such individual of his right to report currently the amount of such gratuities to such employer and the Director shall, by regulation, prescribe the manner of notification and of reporting. The amount of gratuities so reported shall constitute a conclusive determination of the amount received unless the employer, within the time prescribed by regulation, notifies the Director of his disagreement therewith. Gratuities not so reported to the employer in the manner prescribed by such regulations of the Director shall not be wages for any of the purposes of this Act."

"§ 1400. On and after July 1, 1937, contributions shall accrue and become payable by each employer for each calendar year in which he is subject to this Act, with respect to wages payable for employment occurring during the six months' period beginning July 1, 1937, and the calendar years 1938, 1939, and 1940. For the year 1941 and for each calendar year thereafter, contributions shall accrue and become payable by each employer upon the wages paid with respect to employment after December 31, 1940. Such contributions shall become due and shall be paid quarterly on or before the last day of the month next following the calendar quarter for which such contributions have accrued; except that any employer who is delinquent in filing a contribution report or in paying his contributions for any calendar quarter may, at the discretion of the Director, be required to report and to pay contributions on a calendar month basis. Such contributions shall not be deducted, in whole or in part, from the wages of individuals in such employer's employ. If the Director shall find that the collection of any contributions will be jeopardized by delay, he may declare the same to be immediately due and payable.

"In the payment of any contributions, interest, or penalties, a fractional part of a cent shall be disregarded unless it amounts to one-half cent or more, in which case it shall be increased to one cent."

It was argued in the *Myers* case that the drivers were not paid any compensation because the only money which passed moved from the driver to the company exactly as in the instant case, but there we said: "But the statute deals with economic realities, (*Parks Cab Co.* v. *Annunzio,* 412 Ill. 549, 553), and the mechanics of compensation are not material. (*Van Ogden, Inc.* v. *Murphy,* 390 Ill. 133.) The drivers receive remuneration, and that is what is significant." (*Myers* v. *Cummins,* 9 Ill.2d 582, 587.) Here, it is undisputed that at the conclusion of a 12-hour shift the driver paid the company one half of the total meter charges for that shift and that the driver paid the cost of all gasoline from his half. The evidence showed that the driver checked his mileage before and at the end of each shift. The average number of gallons of gasoline for the total mileage run on any one shift would not be difficult to ascertain, and it seems obvious that the net return from a single shift operation to a driver would be computable for purposes of determining compensation or "wages" as defined in sections 234 and 1400 above referred to.

Do the drivers perform any service for plaintiff such as to render the same "employment" within the meaning of section 206? We believe the undisputed facts in this case establish that the drivers do render service. They operate the plaintiff's licensed taxicabs. They use the plaintiff's dispatching facilities, waiting rooms and cab stands. When they operate the cabs, the company has income; when the cabs are not running there is no income, either to the company or to the driver. One of plaintiff's officers testified that the drivers "are their own bosses and go as they please". But only the driver can operate the cab and he has it but 12 hours at a time. While plaintiff under

its automobile rental contract leased its cabs to the drivers, it retained effective control because of the short term of the lease. We must look to the substance and not the form of the transactions. Despite the terms of the contract, an officer of the company testified that the drivers are required to report the destinations on trips so that the company knows at all times where the drivers are; he also testified "we sure check when drivers pick up their own fares and do not bring in enough money for the mileage on the vehicle". We therefore hold that insofar as section 206 relating to employment and section 234 and section 1400 relating to wages are concerned that the drivers were in the employment of plaintiff and that the one-half of the metered fares collected by the drivers less the amounts expended by the drivers for gasoline constituted wages within the meaning of sections 234 and 1400. The facts here are clearly distinguishable from the facts in *Parks,* where only the license was leased by driver-owners for their cabs.

Plaintiff contends, however, that even if the drivers are rendering services and the receipts retained by them are remuneration for personal services, the drivers are specifically excluded from the operation of the act by section 212, since they are not subject to plaintiff's control in operating the cabs, perform their services outside plaintiff's place of business, and are engaged in an independently established business. Failure to establish any one of the requirements of section 212 causes the exemption to fail. In our opinion the evidence fails to establish that the individual driver was free from the control or direction of the plaintiff either under his contract or in fact. Section 7 of the automobile rental contract provides that the driver will at all times comply with the rules and regulations of the police departments and city ordinances of the cities when he operates the cab and will not take the cab outside this State except with the express written permission of plainiff and will at all time comply with and at no time violate the laws of this

State and police regulations, or ordinances or statutes of the municapility in which the cab is operated. In the event of a violation by the driver of said police regulations, or ordinances or statutes the lease shall upon the election of the bailor, either with or without notice, become immediately terminated and plaintiff becomes entitled to immediate possession of the cab. Section 8 provides: "The Bailee agrees that he will not rent or otherwise engage or use the taxicabs or automobiles of any other company operating in competition with said Bailor nor in any way, either directly or indirectly as principal or agent, Bailor or Bailee, engage in the Taxi Cab business other than with the taxi cabs or automobiles of the Bailor, during the term of agreement *or after its expiration,* in the City or Village of —————, Illinois." (Italics added.) The reference in section 6 of the contract heretofore mentioned to the effect that the bailee is at all times to be free from control or direction of the bailor is in fact negated by the evidence both of the company officers and the drivers. We have heretofore held that the existence of general control or of the right to control may be sufficient even though it is not exercised. (*Ross* v. *Cummins,* 7 Ill.2d 595; *Murphy* v. *Daumit,* 387 Ill. 406.) The Director was justified in finding from the evidence that the plaintiff exercised control over the drivers within the meaning of section 212 of the act, and since that finding was not against the manifest weight of the evidence, the trial court erred in setting aside the findings of fact and recommendations of the Director's representative.

The judgment of the circuit court of Cook County is reversed and the cause remanded to that court with direction to enter judgment in favor of the Director of Labor for the amount of the assessment as determined by the director by his order of February 7, 1961.

*Reversed and remanded with directions.*